**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF WASHINGTON**

|  |  |
|---|---|
| *In re* Application for Discovery Pursuant to 28 U.S.C. § 1782 | Case No. 2:25-mc-00019-JAG<br><br>Hon. <u>James A. Goeke</u> |

**SECOND DECLARATION OF MORTEN KINANDER**
**IN OPPOSITION TO RESPONDENT REC SILICON ASA'S MOTION**
**TO QUASH, AND IN SUPPORT OF APPLICANT**
**WATER STREET INC.'S CROSS-MOTION TO COMPEL**

1.      I am a Professor of Law in the Department of Law and Governance and the Director of the Center for Financial Regulation at the BI Norwegian Business School in Oslo, Norway.  I have held this position since 2015.  Prior to 2015, I was an Associate Professor at the BI Norwegian Business School and a practicing lawyer at the Wiersholm Law Firm in Oslo, Norway.  I have more than 20 years' experience studying and working with matters of financial markets law and regulation in Norway.  My qualifications and experience are more fully explained in my initial declaration submitted in this action.  ECF No. 5. at 1–2; ECF No. 5-1.

2.      I previously submitted a declaration in support of Water Street Capital, Inc. ("Water Street")'s application for discovery pursuant to 28 U.S.C. § 1782 to express my opinion on certain questions of Norwegian law.  I submit this declaration in connection to Water Street's motion to compel subpoena

1

compliance and in opposition to Respondent REC Silicon ASA ("REC Silicon")'s motion to quash the subpoena.

3.    For the reasons set forth in this declaration, and based upon the facts presented to me set forth below, it is my firm opinion that the Norwegian administrative investigation of REC Silicon referenced in REC Silicon's motion to quash would not give Water Street access to the documents and information it seeks from REC Silicon in this action for discovery.

## I.    NORWEGIAN INVESTIGATION PROCEEDINGS

4.    I understand that Water Street has requested a formal investigation into the circumstances around the testing of REC Silicon material and Hahwha's termination of the 10-year purchase agreement with REC Silicon.

5.    The formal name of the requested corporate investigation is *gransking*, and it is outlined in Norwegian Public Limited Liability Company Act ("NPLLCA") (Allmennaksjeloven) §§ 5-25 to 5-28.  This is a formal, court-supervised investigation process that in certain key respects is fundamentally different from the U.S. discovery process.  In short summary: The two processes are different not only in legal status but also in what kind of investigation it is, how it is conducted, and which interests it seeks to protect.

### A.    Key Characteristics of Norwegian *Gransking*

6.    In a Norwegian investigation, a dual authorization is required, first from shareholders (the company must agree to an investigation if voted for by

2

minimum 10% of the shareholders), then from a first instance court. The court must approve the request if there is a "reasonable ground" for it, *i.e.,* whether the investigation will probably uncover grounds for critique or breaches of conduct rules, legal or professional.

7.      The process is in principle non-adversarial and non-litigious with focus on internal compliance and governance review. This is first and foremost evidenced by the fact that the court appoints one or more investigator(s) according to NPLLCA § 5-26.3. These investigators are normally qualified and respected lawyers and/or auditors with independent status. The process is governed by the Norwegian Bar Association professional standards for such processes. The Norwegian Bar Association's guidelines for investigations aim to ensure that investigations are conducted with independence, procedural fairness, clarity, and professionalism. While not binding law, they are de facto standards for acceptable investigative conduct and widely used in both private and judicial contexts. They define how investigators must navigate between fact-finding, legal analysis, and ethical obligations, without becoming partisans or adjudicators. This underscores the difference from the adversarial U.S. model. The court determines the remuneration of the investigator(s), the cost of which is borne by the company.

8.      While investigations according to Norwegian law can serve as basis for civil and criminal proceedings, that is not their primary justification or purpose.

## II.    SCOPE AND CONTROL OF NORWEGIAN INVESTIGATIONS

### A.    Document Collection Scope

9.    A court-appointed investigation under NPLLCA §§ 5-25 to 5-28 grants the investigator access to the company's emails, electronic communications, financial records, ledgers, and business archives, according to § 5-27.   This information shall be given without regard to any duty of confidentiality that relevant persons might be subject to, *e.g.*, as a consequence of their employment or position.  Although the statute does not mandate technical procedures such as document preservation notices, the investigator may request full access to operational data as needed.

10.    Documents subject to legal privilege—particularly attorney-client communications—are protected under § 22-5 of the Norwegian Civil Procedure Act and the Court Act § 224.   Norwegian courts strictly uphold such confidentiality, and these materials cannot be accessed by investigators.  As Norwegian law does not discriminate between outside and inside counsel, this would include all communication that the company's legal counsel is or has been involved in.

### B.    Witness Testimony Limitations

11.    Investigations under §§ 5-25 to 5-28 are non-coercive.   The investigator has no subpoena power and cannot compel testimony from unwilling individuals or third parties.  This power is reserved for civil proceedings proper.

4

12.    The requests for information from the investigator that the investigator deems relevant to the *investigation* are, however, basis for court-ordered enforcement.

13.    Company employees are generally obligated to cooperate under the terms of their employment.  However, individuals enjoy robust legal protections against self-incrimination, grounded in the Norwegian Criminal Proceedings Act and Article 6 of the European Convention on Human Rights.  This can have severe implications for the scope of information that the investigator can retrieve, especially if it is the company's directors that are under investigation.

14.    Interviewees are entitled to legal representation during the process. This is a general principle of due process and is reaffirmed in the Norwegian Bar Association's Guidelines for Private Investigations.

15.    There is no authority to compel participation or provide testimony from individuals who are not employees of the company.

**C.    Who Controls the Investigation**

16.    As mentioned above, under NPLLCA § 5-26, the district court appoints the investigator and defines the investigation's mandate.  Once the mandate is defined by the court, the court-appointed investigator has full discretion to determine methodology and information sources within the boundaries of the approved scope.

17.    Requesting shareholders (*e.g.*, Water Street) do not control or influence the investigation.  Their role is limited to initiating the process under

§ 5-25.  The formal client is typically composed of the company's board of directors, legal/compliance department, or audit committee.  These internal bodies may facilitate access but are prohibited from influencing the investigative direction, as the investigator has legally guaranteed independence according to § 5-26.3.

18.    Any amendment to the mandate requires explicit court approval.

**D.    Critical Limitation—International Reach**

19.    The powers of a Norwegian corporate investigation are primarily territorial in nature.  Investigators have no legal authority to access, compel, or investigate foreign subsidiaries, such as REC Silicon's U.S.-based operations as long as these are incorporated under U.S. law.  They cannot require the production of documents, data, or personnel located outside of Norway.

20.    Where foreign subsidiaries or affiliates are involved, the investigation may only proceed through internal corporate governance mechanisms, such as voluntary disclosure, intercompany cooperation, or board-level directives to its subsidiaries.  Multi-jurisdictional investigations typically require coordination through distinct legal processes in each relevant jurisdiction.

### III.    ACCESS TO INFORMATION FOR MINORITY SHAREHOLDERS

21.    Under Norwegian law, minority shareholders such as Water Street would only have access to the *results* of the investigation, and not the underlying evidence collected or reviewed.

**A.      Minority Shareholder Access Rights**

22.      The NPLLCA provides each shareholder with broad information rights, including access to investigation findings.  When the investigation is finished, the court calls an extraordinary general meeting, where the report is to be discussed.  The report is to be sent to all shareholders no later than a week before the general meeting, *cf.* § 5-28 (2).  Shareholders will, therefore, have little influence over the process.

23.      Recent Norwegian Supreme Court case law, HR-2020-1947-A, has established that majority shareholders have a fiduciary duty towards minority shareholders, not to abuse their majority power to squeeze minority shareholders or to make decisions that only benefits majority holders.

**B.      Scope of Access**

24.      Water Street would receive the full investigation report submitted to the district court, but that would be in the capacity as a shareholder and in connection with the summons to the extraordinary general meeting, as described above.  Given that the investigation is taken out of the hands of the company, the board and management have as little control over the investigation as minority shareholders have.  There is in other words no distinction between majority and minority shareholders in access rights or control over the process.

**C.      Limited Confidentiality Protections**

25.      Although the investigation results are generally private information to the shareholders rather than public, there is no general right of confidentiality

applicable to investigation results, as these are court mandated and discussed at the general meeting. There are, however, a few exceptions to this general rule. Specific exemptions include personal affairs information and/or privacy matters, competitively important technical/business matters, and attorney-client privileged material. These issues can severely impact the scope of the investigation.

**D.      Limitations on the Duty to Provide Information**

26.     The way for a shareholder to get information from a Norwegian public company is to ask a question at a general meeting, where management, according to Section 5-15 of the NPLLCP, has a duty to provide the background information. This can typically concern information about the records of this internal review. However, there are some obstacles to actually obtaining the requested records.

27.     First, Section 5-15 is not a document inspection right. It only allows shareholders to ask questions at general meetings about financial matters and agenda items. There is no way of knowing—barring a fully independent investigation—that the company really complied with the information request from shareholders.

28.     Second, as explained above, legal privilege might block access. Documents from external lawyer reviews are or can be protected by attorney-client privilege under Norwegian law, which the Board can invoke to refuse disclosure.

29.     Third, the law allows companies to refuse any disclosure that could harm the company, giving boards broad discretion to deny access to sensitive documents. The general meeting can, however, vote on whether the information should still be given, regardless of any potential to cause "disproportionate harm." Any cause of harm is subject to liability under Section 17-1. The general meeting decides with a majority that the records of the investigation must be produced following a demand from one or more shareholders.

**E.      REC Silicon's "First Instance" Internal Investigation**

30.     I understand that on or about June 20, 2025, REC Silicon publicly announced that it had "conducted an internal review with an external law firm on the factual matters raised in [Water Street's] request [for an investigation] and found no wrongdoing by the Company." There is a long history in Norway of skepticism towards such typical "first instance" attempts at investigation, which are aimed at fending off critique and claims about alleged misconduct. Water Street and other minority shareholders have no assurances under Norwegian law that this internal investigation conducted by REC Silicon was thorough and fair. In general, these denials are not taken very seriously.

31.     Moreover, Water Street and other minority shareholders are highly unlikely to receive any internal investigation report or access to the documents and information considered in connection with the internal investigation.

## IV.    MATERIAL DIFFERENCES BETWEEN U.S. DISCOVERY AND NORWEGIAN INVESTIGATION

32.    While I am not qualified as a U.S. law expert, according to my understanding there are important and substantial material differences between the process and content of a Norwegian administrative investigation described above, and the U.S. discovery process.  These differences are so important as to warrant separate and simultaneous processes.  Below is a non-exclusive list of elements that indicate a foundational difference between the two.

### A.    Fundamental Legal Purposes

33.    The U.S. discovery sought in this 28 U.S.C. § 1782 process is, as far as I understand, based on an adversarial model, with compulsory judicial mechanisms designed to gather documents and sworn evidence in support of legal claims in civil litigation.  The primary mandate is to prepare cases for trial through judicial compulsion.

34.    This is not necessarily the case in Norwegian investigations.  In the Norwegian process, the investigation is an internal governance instrument aimed at examining administrative matters and corporate conduct, not proving liability. The focus is on: Corporate governance compliance and board decision-making processes; Internal organizational culture and management systems; Norwegian regulatory compliance under Securities Trading Act; and General administrative matters rather than specific transaction details.

10

35. As noted above, the process also depends on the voluntary participation of the company, and the process is carried out under self-regulatory rules of conduct provided by the Norwegian Bar Association.

**B.      Procedural Powers—Critical Differences**

36. The advantages of U.S. discovery as compared to a Norwegian investigation in a situation like that of a potential civil proceeding against board members of REC would first and foremost be:

    a. The judicial compulsion through the issuance of subpoenas, that is unavailable under Norwegian law;

    b. Depositions under oath with perjury penalties;

    c. Court-imposed sanctions for non-compliance; and

    d. A broad definition of "relevance" set forth by U.S. federal rules.

37. As indicated above, the limitations of a Norwegian Investigation in such a context would first and foremost be:

    a. That there is no third-party compulsion abilities beyond employment relationships;

    b. That there is voluntary participation for witness testimony with strong self-incrimination protections;

    c. That territorial reach is limited to Norwegian legal entities— foreign affiliates, including wholly owned subsidiaries in the U.S., remain outside its jurisdiction; and

d. That the scope is court-controlled—shareholders cannot direct specific inquiries, even if they have vital knowledge, competence, and strategic business understanding that the investigator does not have or share.

## C.     Information Scope Differences

38.     There are also other important differences. The U.S. Discovery process captures litigation-specific facts relevant to securities law violations and market manipulation. This is not the case for Norwegian investigations, which is first and foremost a fact-finding, administrative process. That the process' overall aim is fact-finding is evidenced by the fact that the court-appointed investigator does not have to be a lawyer but often is an auditor.

39.     For example, third-party communications between REC Silicon's U.S.-based employees and Hanwha personnel would normally fall outside the scope of the purview of a Norwegian administrative investigation, as would technical documentation from Moses Lake facility operations, as well as real-time communications during critical testing periods, unless the company voluntarily decides to require that its U.S. personnel or management produce such information. Similarly, U.S. subsidiary records generally will not be accessible through Norwegian procedures. I understand that these are categories of information at the center of Water Street's request for discovery in this action.

12

## V.    CONCLUSION

40.    The potential Norwegian administrative investigation referenced in REC Silicon's motion to quash cannot substitute for the U.S. discovery Water Street seeks in this action.  The two proceedings are wholly distinct and non-duplicative.

41.    The Norwegian investigation cannot compel testimony from U.S.-based employees.  Its limited international reach prevents access to U.S. subsidiary records and communications.  The investigation scope is controlled by court-appointed investigators, not by Water Street's litigation needs.  The evidence collected is not shared with shareholders in the process.  And there is no judicial compulsion for third parties.

42.    The U.S. discovery sought in Water Street's application thus serves distinct litigation preparation needs that Norwegian administrative investigation cannot fulfill, making both proceedings necessary and legally justified for Water Street's contemplated civil action in Norway.

43.    REC Silicon's contention that the potential Norwegian administrative investigation on similar subjects would render the requested U.S. discovery "duplicative" fails because of:

   a. The fact that the Norwegian administrative investigation is not assured to occur;

   b. The fundamentally different legal processes of the investigation, should it occur, and U.S. discovery, serving

distinct purposes (regulatory compliance versus litigation preparation);

c.  Material limitations in Norwegian investigation powers that U.S. discovery can address; and

d.  Different information scope and accessibility, particularly regarding U.S. operations and third parties.

\* \* \*

Pursuant to Section 1748 of title 28 of the United States Code, I, Morten Kinander, declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. I further understand that this document may be filed in an action or proceeding in a court of law.

Executed on: June 23, 2025

Location: Moss, Norway

**Morten Kinander**